### UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| IN RE:  Family Christian, LLC, *et al.*,[1] | Case No. 15-00643-jtg |
| Debtors. | Chapter 11 |
| _____/ | (Jointly Administered) |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | |
| | Adv. No. |
| Plaintiff, | |
| v. | |
| CREDIT SUISSE AG, | |
| CREDIT SUISSE AG, CAYMAN BRANCH, | |
| CREDIT SUISSE SECURITIES (USA) LLC | |
| CREDIT SUISSE LOAN FUNDING, LLC, | |
| MEDLEY CAPITAL CORPORATION, | |
| CONGRUENT CREDIT OPPORTUNITIES | |
| FUND II, LP, and | |
| MAIN STREET MEZZANINE FUND, LP | |
| _____/ | |
| Defendants. | |

**COMPLAINT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS SEEKING (A) DECLARATORY JUDGMENT AS TO (I) THE VALIDITY, NATURE, AND EXTENT OF LIENS, (II) SECURED STATUS OF CLAIM, AND (III) RECOVERY OF ADEQUATE PROTECTION PAYMENT; (B) AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFER; AND (C) DISALLOWANCE OF CLAIM**

The Official Committee of Unsecured Creditors (the "Committee"), by and through its attorneys, Fox Rothschild LLP, brings this adversary proceeding pursuant to Fed. R. Bankr. P. 7001(2) seeking (A) declaratory judgment as to (I) the validity, nature, and extent of Defendants' liens; (II) secured status of the Claim (as defined below); and (III) recovery of Adequate Protection Payment (as defined below); (B) avoidance and recovery of preferential transfers; and (C) disallowance of Claim (the "Complaint"), and alleges as follows:

---

[1] The Debtors are:  Family Christian, LLC (Case No. 15-00653-jg); Family Christian Holding, LLC (Case No. 15-00642-jtg); and FCS Giftco, LLC (Case No. 15-00644-jtg).

## JURISDICTION AND VENUE

1.      This Court (the "Bankruptcy Court") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a), which is a civil proceeding arising under or arising in or related to a case under title 11 of the United States Code (the "Bankruptcy Code").

2.      This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A), (B), (C), (F), (K), and (O).

3.      Venue of this adversary proceeding is properly in the United States Bankruptcy Court for the Western District of Michigan pursuant to 28 U.S.C. § 1409(a).

4.      This adversary proceeding is commenced pursuant to Rule 7001(2) of the Federal Rules of Bankruptcy Procedure.  By this adversary proceeding, the Committee seeks the entry of a declaratory judgment, pursuant to 11 U.S.C. §§ 363(p)(2), 502 and 544, in favor of the Committee and against the Defendants (as defined below) finding that the Defendants have no security interest in or lien upon the Debtors' fixtures, leases, and inventory, including consigned goods, cash, and any proceeds thereof.  The Committee also seeks the entry of a declaratory judgment, pursuant to 11 U.S.C. § 506, finding that Defendants' Claim is unsecured to the extent that the value of the Defendants' interest in the Term Loan Collateral and in the remaining value of the Working Capital Collateral (as defined herein) is less than the amount of the Claim.[2]  The Committee also seeks the entry of a declaratory judgment, pursuant to 11 U.S.C. § 506, to recover the Adequate Protection Payments (as defined herein) made to Defendants. Additionally, the Committee seeks to avoid and recover, pursuant to Sections 547 and 550 of the Bankruptcy Code, certain preferential transfers that Debtor Family Christian, LLC (the

---

[2]  Capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the referenced document.

"Operating Debtor") made to Defendants.  Lastly, the Committee seeks to disallow the Claim pursuant to 11 U.S.C. § 502.

## PARTIES

5.      Plaintiff, the Committee, was duly formed by the Office of the United States Trustee on February 20, 2015.  Pursuant to the terms of the Final Order Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363 (the "Cash Collateral Order") [D.I. 593], the Committee was granted standing to bring this adversary action.  See Cash Collateral Order at 21:¶ 15.

6.      Upon information and belief, Defendant Credit Suisse AG ("Credit Suisse AG") is a corporation, limited liability company, partnership or sole proprietorship, whose state of incorporation, organization, existence or residence is unknown.   Credit Suisse AG has a registered agent mailing address of 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

7.      Upon information and belief, Defendant Credit Suisse AG, Cayman Branch ("Credit Suisse Cayman") is a corporation, limited liability company, partnership or sole proprietorship, whose state of incorporation, organization, existence or residence is unknown. Credit Suisse Cayman is the Cayman Islands Branch of Credit Suisse AG.

8.      Upon information and belief, Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse Securities" and collectively with Credit Suisse AG and Credit Suisse Cayman, "Credit Suisse") is a limited liability company formed under the laws of the State of Delaware. Credit Suisse Securities has a registered agent mailing address of 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

9.      Upon information and belief, Defendant Credit Suisse Loan Funding, LLC ("Credit Suisse Loan Funding") is a limited liability company formed under the laws of the State

of Delaware.  Credit Suisse Loan Funding has a registered agent mailing address of 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

10.     Upon information and belief, Defendant Medley Capital Corporation ("Medley Capital") is a regulated investment company formed under the laws of the State of Delaware. Medley Capital has a registered agent mailing address of 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

11.     Upon information and belief, Defendant Congruent Credit Opportunities Fund II, LP ("Congruent Credit") is a limited partnership formed under the laws of the State of Delaware. Congruent Credit has a registered agent mailing address of 160 Greentree Drive, Suite 101, Dover, Delaware 19904.

12.     Upon information and belief, Defendant Main Street Mezzanine Fund, LP ("Main Street" and collectively with Credit Suisse Loan Funding, Medley Capital, and Congruent Credit, the "Term Loan Lenders"), is a limited partnership formed under the laws of the State of Delaware.  Main Street has a registered agent mailing address of 1675 S. State Street, Suite B, Dover, Delaware 19901.

13.     Credit Suisse and the Term Loan Lenders are collectively referred to herein as the "Defendants."

## BACKGROUND

A.     **Bankruptcy Proceedings:**

14.     On February 11, 2015 (the "Petition Date"), the Debtors each filed a voluntary petition for relief in the Bankruptcy Court.  By Order entered on February 19, 2015, the Debtors' cases were procedurally consolidated.  [D.I. 106].

15. In support of the Debtors' chapter 11 petition and first day pleadings, on February 11, 2015, the Debtors filed the *Declaration of Chuck Bengochea in Support of Chapter 11 Petition and First Day Motions* (the "Bengochea Declaration") [D.I. 11].

16. On March 4, 2014, the Operating Debtor filed its original Bankruptcy Schedules and Statement of Financial Affairs (the "SOFA") [Docket Nos. 231 and 232], which Bankruptcy Schedules were subsequently amended [D.I. 292]. True and correct copies of the Operating Debtor's Amended Schedule D and SOFA are attached hereto as **Exhibit "A"**, and incorporated herein by reference.

**Credit Suisse's Claim**

17. The Operating Debtor's Amended Schedule D lists Credit Suisse as holding an alleged secured claim in the amount of $34,354,603 ($34,200,000 in principal and $154,603 in interest) (the "Claim") based on various collateral as more fully set forth below.

**B.    Credit Suisse Term Loan:**

18. Pursuant to that certain Term Loan Credit Agreement (the "Term Loan Agreement"), dated as of November 14, 2012, by and among the Operating Debtor, as borrower, Debtor Family Christian Holding, LLC (the "Debtor Holding Company") and Debtor FCS Giftco, LLC (the "Debtor Giftco"), as guarantors, and Credit Suisse, as administrative agent and as collateral agent for the Term Loan Lenders, the Term Loan Lenders extended credit to the Operating Debtor in the original maximum principal amount of $38,000,000.00 (the "Term Loan"), as evidenced by four (4) Promissory Notes in the aggregate amount of the Term Loan (the "Term Loan Notes"). True and correct copies of the Term Loan Agreement and Term Loan Notes are attached hereto as **Exhibit "B"**, and incorporated herein by reference.

19.   In order to secure the Operating Debtor's obligations under the Term Loan Notes, on November 14, 2012, the Operating Debtor, the Debtor Holding Company, and Debtor Giftco, collectively as grantors, made, executed and delivered to Credit Suisse, in its capacity as collateral agent for the Term Loan Lenders, that certain Pledge and Security Agreement (the "Term Loan Security Agreement").   A true and correct copy of the Term Loan Security Agreement is attached hereto as **Exhibit "C"** and incorporated herein by reference.   The Term Loan Agreement, the Term Loan Notes, the Term Loan Security Agreement, and all other related instruments, agreements, and documents executed in connection with the Term Loan are hereinafter referred to collectively as the "Term Loan Documents").

20.   Under the Term Loan Security Agreement, the Debtors pledged, assigned and granted to Credit Suisse, as agent on behalf of and for the benefit of the Term Loan Lenders, a security interest in all of its right, title and interest in, to and under all personal property and other assets (collectively, the "Credit Suisse Collateral").[3]

---

[3] Article II of the Term Loan Security Agreement provides, in pertinent part, as follows:

> Each Grantor hereby pledges, assigns and grants to the Agent, on behalf of and for the ratable benefit of the Secured Parties, a security interest in all of its right, title and interest in, to and under all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Grantor, or in which such Grantor has or at any time in the future may acquire any right, title, or interest, regardless of where located (all of which are collectively referred to as the "([Credit Suisse] Collateral"), including:
>
> |       |                                                                  |
> |-------|------------------------------------------------------------------|
> | (i)   | all Accounts;                                                    |
> | (ii)  | all Chattel Paper;                                               |
> | (iii) | all Copyrights, Domain Names, Patents, Trademarks and Licenses;  |
> | (iv)  | all Documents;                                                   |
> | (v)   | all Equipment;                                                   |
> | (vi)  | all Fixtures;                                                    |
> | (vii) | all General Intangibles;                                         |
> | (viii)| all Goods;                                                       |
> | (ix)  | all Instruments;                                                 |
> | (x)   | all Inventory;                                                   |
> | (xi)  | all Investment Property;                                         |
> | (xii) | all Pledged Collateral;                                          |
> | (xiii)| all cash or cash equivalents;                                    |
> | (xiv) | all letters of credit, Letter-of-Credit Rights and Supporting Obligations; |

21.     The Credit Suisse Collateral does not include leases, supplies, and other goods on "consignment" from various suppliers and vendors.

22.     On November 15, 2012, Credit Suisse, as agent for the Term Loan Lenders, filed with the Clerk of Superior Court Fulton County, Georgia, a Uniform Commercial Code ("U.C.C.") Financing Statement, No. 0602012-10088 (the "First Financing Statement") (as subsequently amended on December 4, 2012), covering "[a]ll personal property owned by [Operating] Debtor, whether now owned or existing, or hereafter arising or acquired or received by [Operating] Debtor, wherever located."

23.     On November 14, 2012, Credit Suisse, as agent for the Term Loan Lenders, filed with the Colorado Secretary of State, a U.C.C. Financing Statement, No. 2012068849 (the "Second Financing Statement" and collectively with the First Financing Statement, the "Financing Statements"), covering "[a]ll personal property owned by Debtor [Giftco], whether now owned or existing, or hereafter arising or acquired or received by Debtor [Giftco], wherever located."   True and correct copies of the Financing Statements are attached hereto as **Exhibit "D"**, and incorporated herein by reference.

---

|       |                                                                                       |
|-------|---------------------------------------------------------------------------------------|
| (xv)  | all Deposit Accounts and Securities Accounts with any bank or other financial institution; |
| (xvi) | all Commercial Tort Claims as specified from time to time in Schedule IV; and         |
| (xvii)| all accessions to, substitutions for and replacements, proceeds (including Stock Rights), insurance proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto, any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and guaranties given by any Person with respect to the foregoing. |

See **Exhibit "C"**, Term Loan Security Agreement at 7, Article II.

24.     The Financing Statements do not make any reference to fixtures.  To the best of the Committee's knowledge, there are no additional U.C.C. Financing Statements filed by Credit Suisse, or any of the other Defendants, against any of the Debtors.

25.     In the event that Defendants aver that they have a perfected security interest in and to the Debtors' leases, upon information and belief, Defendants failed to record any security interests in any of the Debtors' leases in the real property records of where the Debtors' leased premises are located.

**C.     Revolver Loan Agreement:**

26.     The Operating Debtor, as borrower, and the Debtor Holding Company and Debtor Giftco, as guarantors, are parties to that certain Credit Agreement (the "Revolver Loan Agreement"), dated November 14, 2012, with FC Special Funding ("FC Funding" or "Senior Lender"), as assignee of JPMorgan Chase Bank, N.A, as agent and letter-of-credit issuer, and J.P. Morgan Securities Inc., as lead arranger and sole book runner (collectively referred to herein as the "Original Senior Lenders"), under which a revolving line of credit was made available to the Operating Debtor up to a maximum of $40,000,000 (the "Revolver Loan"), as evidenced by that certain Note, dated November 14, 2012, by the Operating Debtor in favor of Original Senior Lenders (the "Revolver Note").

27.     Pursuant to the terms of the Revolver Loan Agreement, the Debtor Holding Company and Debtor Giftco agreed to be jointly and severally liable as primary obligor for the prompt payment of the Operating Debtor's obligations under the Revolver Loan Agreement.

28.     In order to secure the Operating Debtor's obligations under the Revolver Note, on November 14, 2012, the Operating Debtor, the Debtor Holding Company and Debtor Giftco, each a grantor, made, executed and delivered to JPMorgan Chase Bank, N.A., as agent for the

Original Senior Lenders, that certain Pledge and Security Agreement (the "Revolver Loan Security Agreement").  A copy of the Revolver Loan Security Agreement is attached hereto as **Exhibit "E"**, and incorporated herein by reference.

29.     Under the Revolver Loan Security Agreement, the Debtors pledged, assigned and granted to Original Senior Lenders a security interest in and to all personal property and other assets, whether owned or consigned by or to, or leased from or to, the Debtors, regardless of where located (collectively, the "Revolver Loan Collateral").[4]

---

[4] Article II of the Revolver Loan Security Agreement provides, in pertinent part, as follows:

> The Grantor hereby pledges, assigns and grants to the Agent, on behalf of and for the ratable benefit of the Lenders, a security interest in all of its right, title and interest in, to and under all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Grantor (including under any trade name or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Grantor, and regardless of where located, including the following assets of the Grantor:

> |       |                                                                 |
> |-------|-----------------------------------------------------------------|
> | (i)   | all Accounts;                                                   |
> | (ii)  | all Chattel Paper;                                              |
> | (iii) | all Documents;                                                  |
> | (iv)  | all Equipment;                                                  |
> | (v)   | all General Intangibles;                                        |
> | (vi)  | all Goods;                                                      |
> | (vii) | all Instruments;                                                |
> | (viii)| all Inventory;                                                  |
> | (ix)  | all Investment Property;                                        |
> | (x)   | all cash or cash equivalents;                                   |
> | (xi)  | all letters of credit, Letter-of-Credit Rights, and Supporting Obligations; |
> | (xii) | all Deposit Accounts with any bank or other financial institution; |
> | (xiii)| all Commercial Tort Claims;                                     |
> | (xiv) | all Assigned Contracts;                                         |
> | (xv)  | all Pledged Deposits; and                                       |
> | (xvi) | all accessions to, substitutions for and replacements, proceeds (including Stock Rights), insurance proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto[.] |

See **Exhibit "E"**, Revolver Loan Security Agreement at 5, Article II.

30.     On November 17, 2014, the Original Senior Lenders assigned all of their right, title and interest in the Revolver Loan Agreement, the Revolver Loan, the Revolver Note, the Revolver Loan Security Agreement, and the Revolver Loan Collateral to FC Special Funding, as assignee (the "Senior Lender" or "FC Funding"), in exchange for the payment of $36,515,750.12, pursuant to that certain Assignment and Assumption Agreement (the "Revolver Assignment").

31.     The Revolver Loan Agreement, the Revolver Note, the Revolver Loan Security Agreement, and the Revolver Assignment, and all related instruments, agreements, and other documents executed in connection with the Revolver Loan are hereinafter referred to collectively as the "Revolver Loan Documents".

32.     FC Funding has averred that it has a properly perfected security interest in and first priority lien upon the Working Capital Collateral, including the Debtors' cash, leases, inventory, including consigned goods and the proceeds thereof.

**D**.     **Intercreditor Agreement:**

33.     JP Morgan Chase Bank, N.A., as agent for the Original Senior Lenders, and Credit Suisse, as agent for the Term Loan Lenders, are parties to that certain Intercreditor Agreement, dated November 14, 2012 (the "Intercreditor Agreement").  A copy of the Intercreditor Agreement is attached hereto as **Exhibit "F"**, and incorporated herein by reference.

34.     Pursuant to the Intercreditor Agreement, "the Liens of (a) the Working Capital Agent in the Working Capital Collateral have and shall have priority over the Liens of the Term Loan Agent upon the Working Capital Collateral (and such Liens of the Term Loan Agent are and shall be junior and subordinate to the Liens of Working Capital Agent); and (b) the Term Loan Agent in the Term Loan Collateral have and shall have priority over the Liens of the

Working Capital Agent upon the Term Loan Collateral (and such Liens of the Working Capital Agent are and shall be junior and subordinate to the Liens of the Term Loan Agent.)." See **Exhibit "F"**, Intercreditor Agreement at 8, Sect. 2.2.

35.     The Term Loan Lenders' liens upon the Working Capital Collateral are subordinate to the Original Senior Lenders' liens upon the Working Capital Collateral.  Id.

36.     According to the terms of the Intercreditor Agreement, the Term Loan Lenders have first position liens as against the Term Loan Collateral, which includes (i) all Copyrights, Domain Names, Patents, Trademarks and Licenses; (ii) all Equipment; (iii) all Fixtures; (iv) furniture (v) all General Intangibles; (vi) all Goods; (vii) all Pledged Collateral; (viii) all Letters-of-Credit Rights; (ix) all Investment Property; and (x) all Commercial Tort Claims.

        E.     **Credit Suisse Failed To Properly Perfect Its Liens:**

37.     Credit Suisse's vague and overly broad language in the Financing Statements that it has a lien in "all personal property" is not sufficient to properly perfect its lien in the Debtor's fixtures.  As such, Credit Suisse does not have a secured claim in the Debtors' fixtures.

38.     Additionally, under the terms of the Term Loan Security Agreement, the Credit Suisse Collateral may not include goods on consignment to the Debtors.  To the extent that Credit Suisse had knowledge of the consignments and did not include such inventory in its determination to make or maintain the Term Loan, Credit Suisse's claim that the consignment goods constitute collateral as inventory may be incorrect.  Accordingly, if Credit Suisse avers that its Claim is secured by the value of consignment goods, the Claim should be disallowed as a secured claim.

39.     Also, under the terms of the Term Loan Security Agreement, the Credit Suisse Collateral does not include any interest in the Debtors' leases, or the proceeds thereof.  If Credit

11

Suisse avers that it holds a security interest in and to the Debtors' leases, and the proceeds thereof, Credit Suisse's failure to record its security interests in the Debtors' leases in the real property records where each of the leased premises are located results in an unperfected security interest.  As a result, Credit Suisse does not have a secured claim collateralized by the leases.

40.    Moreover, upon information and belief, the Operating Debtor commingled cash consisting of charitable donations and cash proceeds from accounts receivable.  As stated in the Operating Debtor's SOFA, the Operating Debtor "receives charitable donations from its customers and employees to be transferred to Family Christian Resource Centers, Inc. . . . [and these] [a]mounts are periodically sent to FCRC throughout the year."  See **Exhibit "A"**, SOFA at 3(c) (emphasis added).  See also Transcript, dated March 11, 2015, First Meeting of Creditors at 56:22-25; 57:1-4 (MR. DADY: . . . "As far as collecting donations from customers that we pass through to the parent, no, that does not. MR MAGGIO: Do you keep separate records of that?  MR. DADY: Separate records?  It's not a separate general ledger.  When we collect that money, it's a debit cash and it's a credit intercompany payable to the parent company.").  According to testimony at the first meeting of creditors, donations are collected at the register along with cash from sales, and then funneled up into accounts for which Credit Suisse does not have possession or control, before then being funneled up to the Cash Collateral Account held at JP Morgan Chase Bank, N.A.  As such, the Operating Debtor's cash, and any proceeds thereof, are not "identifiable cash proceeds" under Article 9 of Georgia's U.C.C.  Accordingly, Credit Suisse's security interest in the Operating Debtor's cash, and any assets acquired with the Operating Debtor's cash, is unperfected.

41.    Lastly, to the extent that the Term Loan proceeds were extended based upon the Term Loan Lenders' first priority liens in and to the Term Loan Collateral, and subordinated

liens in and to the Working Capital Collateral, the Claim should be disallowed as a secured claim because the value of the Term Loan Collateral, and the remaining value of the Working Capital Collateral (after deducting the value of the Working Capital Collateral necessary to satisfy the Senior Lender's claim), is grossly deficient to the Claim amount.  As such, the Claim should be disallowed as a secured claim to the extent of the deficiency, and reclassified as unsecured.

**F.**    **Post-Petition Adequate Protection Payments to Defendants:**

42.    Pursuant to the Interim Order Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363 (the "First Interim Cash Collateral Order") [D.I. 114], during the First Interim Period, the Debtors remitted, pursuant to 11 U.S.C. § 361(1), $200,000 in adequate protection payments to the Term Loan Lenders' legal counsel and financial advisor ("the "Adequate Protection Payments").

**G.**    **Payments to Defendants Within Ninety (90) Days of the Petition Date:**

43.    According to Exhibit 1 to the Operating Debtor's SOFA, within ninety (90) days of the Petition Date, the Operating Debtor transferred and/or caused to be transferred, to or for the benefit of Defendants in the form of one or more payments of monies and/or transfers of goods in, at least, the total amount of $1,076,634.30.  See **Exhibit "A"**, SOFA at Exhibit 1 at 11.

**COUNT ONE**
**(Declaratory Judgment to Determine the Validity, Extent, and Priority of Defendants'**
**Liens, Claims, Encumbrances, and Interests in the Term Loan Collateral, the Working**
**Capital Collateral, Goods on Consignment, Leases, Cash, and any Proceeds Thereof**
**Pursuant to 11 U.S.C. §§ 363(p)(2), 502 and 544)**

44.    The Committee repeats and re-alleges the allegations contained in paragraphs 1 through 43 of this Complaint as if the same were set forth herein.

45.    This is an action for equitable and declaratory relief brought pursuant to Fed. R. Bankr. P. 7001(2), 11 U.S.C. §§ 363(p)(2), 502, and 544 to determine the validity, extent, and

priority of Defendants' liens, claims, encumbrances, and interest in (A) Term Loan Collateral; (B) the Working Capital Collateral; (C) goods on consignment; (D) leases; (E) cash; and (F) any proceeds of the foregoing.

46.     Pursuant to 11 U.S.C. § 363(p)(2), the Defendants have the burden of proof to demonstrate the validity, extent, and priority of their liens, claims, encumbrances, and interests in the Term Loan Collateral, the Working Capital Collateral, goods on consignment, leases, cash, and any proceeds thereof.

47.     11 U.S.C. § 544(a)'s "strong arm clause" and the terms of the Cash Collateral Order grants the Committee the rights of a creditor holding a hypothetical lien to avoid any transfer of property of the Debtors or any obligation incurred by the Debtors that is voidable.  11 U.S.C. § 544(a).

48.     11 U.S.C. §502(a) provides that "a claim or interest, proof of which is allowed under section 501 of this title, is deemed allowed, unless a party in interest objects."  11 U.S.C. §502(a).  Pursuant to Fed. R. Bankr. P. 3003 (b), "the schedule of liabilities filed pursuant to § 521(1) of the Code shall constitute prima facie evidence of the validity and the amount of the claims of creditors, unless they are scheduled as disputed, contingent, or unliquidated."  Fed. R. Bankr. P. 3003(b).  Additionally, Fed. R. Bankr. P. 3003(b) provides that it shall "not be necessary for a creditor or equity security holder to file a proof of claim or interest except as provided in subdivision (c)(2) of this rule."  Fed. R. Bankr. P. 3003(b)(1).

49.     With respect to the validity and perfection of liens upon collateral, Section 11-9-301 of Georgia's U.C.C. sets forth rules to determine the law governing perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral.  Ga. Code Ann. § 11-9-301.

50.     Article 9 of Georgia's U.C.C. explicitly does not apply to the "creation or transfer of an interest in or lien on real property, including a lease or usufruct or rents thereunder."  Ga. Code Ann. § 11-9-109(d)(11).  See In re Polo Club Apartments Assoc. Ltd. P'ship, 150 B.R. 840, 845-846 (Bankr. N.D. Ga. 1993) (a U.C.C. filing concerning an assignment of a lease or rents thereunder is of no effect, and the only means to perfect a security interest in a lease or the rents thereunder is by "filing and recording these instruments in the appropriate real property records.").

51.     In connection with continuation of perfection of a security interest in cash, and the proceeds thereof, pursuant to Section 11-9-315 of Georgia's U.C.C., except as otherwise provided in Section 11-9-315 and in Ga. Code Ann. § 11-2-403, a "security interest attaches to any identifiable proceeds of collateral."  Ga. Code Ann. § 11-9-315(a)(2).  Pursuant to Section 9-315(d)(3) of Georgia's U.C.C., "a perfected security interest in proceeds becomes unperfected on the twenty-first day after the security interest attaches to the proceeds unless . . . (3) the proceeds are identifiable cash proceeds."  Ga. Code Ann. § 11-9-315(d)(3).  Proceeds that are commingled with other property are identifiable proceeds only: "(1) if the proceeds are goods, to the extent provided by Code Section 11-9-336; and (2) if the proceeds are not goods, to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable principles, that is permitted under law other than this article with respect to commingled property of the type involved."  Ga. Code Ann. § 11-9-315(b)(1)-(2).

52.     Additionally, with respect to perfecting a security interest in goods on a consignment basis, the vast majority of courts to have addressed this issue have concluded that the secured lender's actual knowledge that its borrower is holding inventory on a consignment

basis defeats the lender's later claim that the inventory constitutes collateral.  See e.g., Matter of High-Line Aviation, Inc., 149 B.R. 730, 737 (Bankr. N.D. Ga. 1992).

53.    Pursuant to 11 U.S.C. §§ 502 and 544, Article 9 of Georgia's U.C.C., and state real property recording statutes, Defendants did not properly perfect or maintain perfection, and therefore, do not hold valid and perfected liens on, or security interest in, the Debtors' fixtures, goods on consignment, leases, or cash, and any proceeds thereof.

54.    Pursuant to 11 U.S.C. §§ 502 and 544, Article 9 of Georgia's U.C.C., and state real property recording statutes, Defendants do not hold a valid and perfected lien on, or security interest in, the Debtors' fixtures because the Defendants' Financing Statements do not reasonably identify fixtures as collateral.

55.    Pursuant to 11 U.S.C. §§ 502 and 544, and Article 9 of Georgia's U.C.C., Defendants do not hold a valid and perfected lien on, or security interest in, the Debtors' goods on consignment because they are not within the scope of the Credit Suisse Collateral and because Credit Suisse had knowledge of the inventory on a consignment basis defeats any claim that it constitutes Credit Suisse Collateral.

56.    Defendants do not hold a valid and perfected lien on, or security interest in, the Debtors' leases because the Debtors' leases were not within the scope of the Credit Suisse Collateral.  In the event that it is determined that Defendants hold a security interest in the Debtors' leases, the Defendants' security interest would be unperfected because the Defendant(s) failed to properly perfect the security interest.  As such, Defendants do not have a secured claim collateralized by the leases.

57.    Operating Debtor's cash, and any proceeds thereof, are not "identifiable cash proceeds" under Article 9 of Georgia's U.C.C. because cash generated from accounts receivable

were commingled with charitable donations.  As such, Defendants do not have a secured claim collateralized by the Operating Debtor's cash, and any proceeds thereof.

58.     The Committee seeks a declaratory judgment in its favor and against Defendants: (A) determining the validity, extent, and priority of Defendants' liens, claims, encumbrances, and interests in the Term Loan Collateral, the Working Capital Collateral, goods on consignment, fixtures, leases, cash, and any proceeds thereof; (B) determining that Defendants do not hold a valid and perfected lien on, or security interest in, the Debtors' fixtures, goods on consignment, leases, cash, and any proceeds thereof; and (C) finding that Defendants' Claim is not secured to the extent that it is collateralized by invalid and unperfected liens on, or security interests in, the Term Loan Collateral, the Working Capital Collateral, goods on consignment, fixtures, leases, cash, and any proceeds thereof.

## COUNT TWO
### (Declaratory Judgment Determining Secured Status Of Claim – 11 U.S.C. § 506)

59.     The Committee repeats and re-alleges the allegations contained in paragraphs 1 through 58 of this Complaint as if the same were set forth herein.

60.     11 U.S.C. § 506(a)(1) permits a bankruptcy court to determine the secured portion and unsecured portion of an allegedly secured claim.  11 U.S.C. § 506(a)(1) provides, in pertinent part, that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest. . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property. . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim."  11 U.S.C. § 506(a)(1).  § 506(d)(1) and (2) provides that to the "extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void. . ." 11 U.S.C. § 506(d).

61.     Defendants' Claim is unsecured to the extent that the value of the Term Loan Collateral and the value of Defendants' interest in the Working Capital Collateral are less than the amount of the Claim.  See Cash Collateral Order at 10:¶3(c).

62.     The Committee seeks a declaratory judgment in its favor and against Defendants finding that the Claim is unsecured to the extent that the value of the Term Loan Collateral and the value of Defendants' interest in the Working Capital Collateral are less than the amount of the Claim.

## COUNT THREE
### (Recovery of Adequate Protection Payments – 11 U.S.C. § 506)

63.     The Committee repeats and re-alleges the allegations contained in paragraphs 1 through 62 of this Complaint as if the same were set forth herein.

64.     Upon information and belief, Defendants' Claim is unsecured to the extent that the value of the Term Loan Collateral, and the remaining value of the Working Capital Collateral (after deducting the value of the Working Capital Collateral necessary to satisfy the Senior Lender's claim), are less than the amount of the Claim and have remained that way since the Petition Date.  See Cash Collateral Order at 10:¶3(c).

65.     Pursuant to the Bankruptcy Code and the Cash Collateral Order, the Defendants shall reimburse the Debtors' estates to the extent that the Adequate Protection Payments exceed the secured amount of its allowed Claim.

## COUNT FOUR
### (Avoidance of Preferential Transfers Pursuant to 11 U.S.C. § 547)

66.     The Committee repeats and re-alleges the allegations contained in paragraphs 1 through 65 of this Complaint as if the same were set forth herein.

67.    On or within ninety (90) days before the Petition Date (the "<u>Preference Period</u>"), the Operating Debtor transferred and/or caused to be transferred, to or for the benefit of Defendants in the form of one or more payments of monies and/or transfers of goods in, at least, the total amount of $1,076,634.30, as more specifically set forth below (the "<u>Transfers</u>")

| <u>Transfer Date</u> | <u>Recipient</u> | <u>Transaction Description</u> | <u>Amount</u> |
|---|---|---|---|
| 11/14/2014 | Credit Suisse Securities (USA) LLC | EFT | $ 36,250.00 |
| 2/6/2015 | Credit Suisse Securities (USA) LLC | EFT | $1,040,384.30 |
| | | **Total** | **$1,076,634.30** |

<u>See</u> **Exhibit "A"**, SOFA at <u>Exhibit 1</u> at 11.

68.    Each of the Transfers constituted a transfer of an interest in property of the Operating Debtor.

69.    The Transfers were made, or caused to be made, for or on account of one or more antecedent debts owed by the Operating Debtor to Defendants prior to the date on which such Transfer was made, namely, the obligations under the Term Loan Documents.

70.    The Transfers were made while the Operating Debtor was insolvent.

71.    The Transfers enabled Defendants to receive more than they would have received if the Debtors' cases were cases under chapter 7 of the Bankruptcy Code, if the Transfers had not been made and if the Defendants received payment of the debt(s) relating to each such Transfer to the extent provided by the provisions of the Bankruptcy Code.

72.    Based upon the foregoing, the Transfers constitute avoidable preferential transfers pursuant to Section 547(b) of the Bankruptcy Code.

## COUNT FIVE
### (Recovery of Avoided Transfers Pursuant To 11 U.S.C § 550)

73.     The Committee repeats and re-alleges the allegations contained in paragraphs 1 through 72 of this Complaint as if the same were set forth herein

74.     Pursuant to Section 547(b) of the Bankruptcy Code, the Committee may avoid the Transfers and, pursuant to Section 550(a) of the Bankruptcy Code, the Committee may recover for the benefit of the Debtors' estates the Transfers, or the value of the Transfers, from the Defendants.

## COUNT SIX
### (Disallowance of Claim Pursuant to 11 U.S.C. §§ 502(d) and 502(j))

75.     The Committee repeats and re-alleges the allegations contained in paragraphs 1 through 77 of this Complaint as if the same were set forth herein.

76.     The Defendants are entities from which property is recoverable under Section 550 of the Bankruptcy Code.

77.     The Defendants are transferees of all of the Transfers, and have not turned over the Transfers, for which the Defendants are liable under Section 550 of the Bankruptcy Code.

78.     Pursuant to Section 502(d) of the Bankruptcy Code, the Claim of the Defendants against the Debtors' estates must be disallowed until such time as the Defendants pay to the Debtors' estates an amount equal to the aggregate amount of the Transfers.

79.     Pursuant to Section 502(j) of the Bankruptcy Code, the Claim of the Defendants against the Debtors' estates previously allowed by the Debtors must be reconsidered and disallowed until such time as the Defendants pay to the Debtors' estates an amount equal to the aggregate amount of the Transfers.

WHEREFORE, the Committee respectfully requests that the Bankruptcy Court enter judgment in its favor and against the Defendants:

(a)    declaring any lien on fixtures, consigned goods, leases and cash, and any proceeds thereof, invalid, and that Defendants do not have a secured claim collateralized by the value of the fixtures, consigned goods, leases and cash;

(b)    declaring that the Claim is unsecured to the extent that the value of the Term Loan Collateral, and the remaining value of the Working Capital Collateral (after deducting the value of the Working Capital Collateral necessary to satisfy the Senior Lender's claim), are less than the amount of the Claim;

(c)    declaring that the Transfers to the Defendants constitute avoidable preferential transfers pursuant to Section 547 of the Bankruptcy Code;

(d)    avoiding the Transfers and directing and ordering that the Defendants return funds in the amount of the avoided Transfers to the Debtors' estates, pursuant to Section 550 of the Bankruptcy Code;

(e)    disallowing the Claim pursuant to Sections 502(d) and 502(j) of the Bankruptcy Code until such time as (i) the Defendants turnover to the Debtors' estates any property deemed recovered pursuant to Section 550 of the Bankruptcy Code, and/or (ii) the Defendants have paid the amount for which the Defendants are liable pursuant to Section 550 of the Bankruptcy Code;

(f)    declaring that pursuant to 11 U.S.C. § 506 and the Cash Collateral Order, the Adequate Protection Payments are recoverable to the Debtors' estates, and ordering the Defendants to reimburse the Debtors' estates to the extent that the Adequate Protection Payments exceed the allowed secured amount of the Claim; and

(g)    awarding the Committee such other and further relief as may be just and proper.                                                 Respectfully submitted

**FOX ROTHSCHILD LLP**
By: */s/ Jason C. Manfrey*
Michael G. Menkowitz
Paul J. Labov
Jason C. Manfrey
2000 Market Street, 20th  Floor
Philadelphia, PA  19103-3291
Phone (215) 299-2000/Fax (215) 299-2150
mmenkowitz@foxrothschild.com
plabov@foxrothschild.com
jmanfrey@foxrothschild.com

Dated:  May 8, 2015                                   Counsel to Plaintiff, the Official Committee
of Unsecured Creditors